# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-00707-SCT

*DIANNE TRUDDLE, AS MOTHER AND
WRONGFUL DEATH BENEFICIARY OF ERIC
CARMICHAEL, DECEASED*

*v.*

*BAPTIST MEMORIAL HOSPITAL-DESOTO,
INC.; AND SUNIL MALHOTRA, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/25/2013 |
| TRIAL JUDGE: | HON. ROBERT P. CHAMBERLIN |
| TRIAL COURT ATTORNEYS: | BENJAMIN NOAH PHILLEY |
| | CLINTON M. GUENTHER |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | BENJAMIN N. PHILLEY |
| ATTORNEYS FOR APPELLEES: | WALTER ALAN DAVIS |
| | SARAH KATHERINE EMBRY |
| | CLINTON M. GUENTHER |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 11/06/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Diane Truddle, as mother and wrongful-death beneficiary of Eric Carmichael, sued

Baptist Memorial Hospital-Desoto, Inc., and Dr. Sunil Malhotra after Carmichael committed

suicide upon being discharged from Baptist. The trial court granted summary judgment in

favor of Baptist and Dr. Malhotra and entered a final judgment in their favor as a matter of

law. Truddle appealed to this Court. Finding that the trial court did not err in granting Defendants' motion for summary judgment, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On June 9, 2008, Carmichael was admitted to Baptist complaining of chest pains and was seen by internist Dr. Malhotra. After undergoing some tests, Carmichael was diagnosed with a gastric ulcer, gastritis, esophagitis, questionable pericarditis, and normal coronary arteries following a heart catheterization.

¶3. On June 12, 2008, the night before Carmichael was discharged from Baptist, he became agitated and aggressive. He took the IV out of his arm and attempted to leave the hospital, but nurses stopped him and forced him back to his room. During this encounter, one nurse stated that Carmichael said someone was "trying to rape him." Truddle characterized this episode as a hallucination, but Dr. Malhotra and Baptist pointed to the deposition of Jeremy Newsome, a friend of Carmichael, who stated that this was in jest. The attending nurse that night noted the incident on Carmichael's chart; however, Dr. Malhotra was not informed of the incident and did not review the nurse's note before discharging Carmichael the next day.

¶4. Prior to discharge, Carmichael and Truddle told Dr. Malhotra that Carmichael wished to remain in the hospital a few more days. In her deposition, Truddle stated that she told Dr. Malhotra that she did not want Carmichael to be discharged because "he had had an outburst the night before" and that Carmichael stated that "something they gave me [medications] made me crazy." Among the drugs Carmichael was prescribed was Reglan, which Truddle

2

asserts potentially put Carmichael at a higher risk of suicide.[1]  However, neither Carmichael nor Truddle raised any concerns about Carmichael hurting himself or having any suicidal ideation. Despite Truddle's concerns, Carmichael was discharged, and Dr. Malhotra told Carmichael to return if he did not feel better. Dr. Malhotra also scheduled a followup visit to check Carmichael's progress and treatment of the ulcer.

¶5.     Carmichael and Truddle returned for his followup appointment with Dr. Malhotra four days later. Truddle stated that she told Dr. Malhotra that Carmichael was complaining that the medications he was taking were "making [him] crazy," and that Carmichael had been complaining that "[h]e had a mental status change on [the night before he was discharged]." Truddle also stated that she told Dr. Malhotra that Carmichael refused to leave the hospital with her the day he was discharged from Baptist.  Dr. Malhotra examined Carmichael for the gastrointestinal issues that were the basis for his admission to Baptist. Truddle then stated that Dr. Malhotra wrote Carmichael another prescription for Reglan and told him he did not have to take any more pain medication and that Carmichael should follow up with him in three to four weeks.

¶6.     The day after seeing Dr. Malhotra, and five days after being discharged from Baptist, Carmichael told his friend Natlin Porter that he was "tired of living."  That same day, Carmichael told his cousin that he needed a gun, and that he wanted to see his deceased

---

[1] Truddle does not claim that Reglan caused Carmichael to commit suicide. Instead, she claims that, because Carmichael was taking Reglan, Dr. Malhotra should have known Carmichael was at a higher risk of suicide. And while the record does contain a list of some of the potential side effects of Raglan, the list cited by the dissent from drugs.com does not appear in the record and the record does not indicate that Dr. Malhotra ever referred to that website.

cousin, Tavares. Carmichael subsequently drove from Southaven to Sardis to retrieve the handgun he used to kill himself. The next day, Carmichael called his girlfriend and asked her to take care of his sister and mother if something happened to him. He then sent a text message to a number of his friends saying he wanted them to know that he was now resting in peace. Later that day, six days after being released from Baptist and two days after his last appointment with Dr. Malhotra, Carmichael barricaded himself in his bedroom and committed suicide.

¶7. Subsequently, Carmichael's mother, Truddle, filed a medical-malpractice and wrongful-death suit against Dr. Malhotra and Baptist, setting out claims for medical negligence, vicarious liability, breach of warranty, wrongful death, torturous breach of contract, gross negligence, and punitive damages. Both parties took part in substantial discovery, and each retained experts. Truddle's experts indicated they would testify that Dr. Malhotra and Baptist were negligent, breached the applicable standard of care, and proximately caused Carmichael's suicide. Experts for Dr. Malhotra and Baptist stated they would testify that Dr. Malhotra and Baptist acted reasonably under the circumstances and did not cause Carmichael's suicide.

¶8. Baptist and Dr. Malhotra also filed motions for summary judgment. In their motions, Baptist and Dr. Malhotra asserted that, under Mississippi law, a suicide is actionable only when a defendant's intentional wrongful act proximately caused an irresistible impulse resulting in the suicide. Baptist and Dr. Malhotra argued that Truddle never pleaded, nor could she create, a genuine issue of material fact as to "any intentional wrongful act" committed by the defendants that caused Carmichael to commit suicide.

4

¶9.     The trial court held a hearing on the motions, took the arguments under advisement, and subsequently granted Dr. Malhotra's and Baptist's motion for summary judgment.

## DISCUSSION

### I.      Whether the trial court erred in holding that Mississippi law bars medical-negligence actions arising from an individual's suicide.

¶10.    This Court reviews a trial court's grant of a motion for summary judgment de novo. *Hospital MD, LLC v. Larry*, 138 So. 3d 922, 925 (Miss. 2014).  We review the evidence presented in the light most favorable to the party opposing the motion. *Johnson v. Pace*, 122 So. 3d 66, 68 (Miss. 2013).  Summary judgment in favor of the moving party is appropriate as a matter of law when, taking all the evidence together in the motion, "there is no genuine issue as to any material fact."  Miss. R. Civ. P. 56.

¶11.    This Court first noted in the seminal case of *State for Use and Benefit of Richardson v. Edgeworth* that a rebuttable presumption exists "that a person will not destroy himself by suicide." *State for Use and Benefit of Richardson v. Edgeworth*, 214 So. 2d 579, 585 (Miss. 1968). Citing cases denying recovery in wrongful-death actions in which the decedent committed suicide, the Court cited the common-law rule that suicide is an "unforeseeable, intervening cause . . . which breaks the causal connection between the wrongful act and the death." *Id.* at 586.  However, the *Edgeworth* Court recognized an exception to the common-law rule, allowing recovery against a defendant resulting from a suicide only if the suicide was proximately caused by the intentional act of the defendant, creating an irresistible impulse in the decedent to take his or her own life. *Id.* at 586-88; *Collums ex rel Collums v. Union Planters Bank, N.A.*, 832 So. 2d 572, 578 (Miss. Ct. App. 2002); *Shamburger v.*

*Grand Casino of Miss., Inc./Biloxi*, 84 F. Supp. 2d 794, 798-99 (S.D. Miss. 1998). The *Edgeworth* Court reasoned that intentional acts which cause an irresistible impulse to commit suicide should be compensable because "[a] higher degree of responsibility is imposed upon a wrongdoer whose conduct was intended to cause harm than upon one whose conduct was *negligent*." *Edgeworth*, 214 So. 2d at 587 (emphasis added).

¶12.    The Court went on to note that, "[i]f he took his own life through an uncontrollable impulse and without conscious volition to cause death, and the mental condition was caused by the injury, the death was compensable." *Id.* at 587 (quoting *Prentiss Truck & Tractor Co. v. Spencer*, 87 So. 2d 272 (Miss. 1956)). In sum, to recover against a third party for a decedent's suicide, the *Edgeworth* Court held that a plaintiff must plead and prove: (1) the decedent was under an "irresistible impulse" rendering him or her unable to discern the nature or consequences of suicide, and (2) the "irresistible impulse" was proximately caused by the defendant's intentional conduct. *Edgeworth*, 214 So. 2d at 587. Federal courts have applied *Edgeworth* in this manner as well. *See Shamburger v. Grand Casino of Miss., Inc./Biloxi*, 84 F. Supp. 2d 794, 798-99 (S.D. Miss. 1998); *Hare v. City of Corinth*, 814 F. Supp. 1312, 1326 (N.D. Miss. 1993), *vacated on other grounds by Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996).

¶13.    After quoting the general rule against recovery for suicide and this Court's precedent noted above, the trial court found that "the state of the law in Mississippi *at this time* is that there exists one exception to the general rule, the irresistible impulse exception." The trial court then addressed whether Truddle had met the exception, finding the plaintiff had not produced any evidence of an intentional act by Dr. Malhotra or Baptist that created an

6

irresistible impulse within Carmichael to commit suicide. This was "despite the plaintiff's assertion that such [an intentional] act was committed by the hospital or Malhotra by not providing a psychological consult to [Carmichael]"; however, the trial court found that these accusations rose, at most, to the level of mere negligence.

¶14. The trial court also noted the withdrawn opinion of *Young v. Guild*, 2008 WL 4740038 (Oct. 30, 2008), *opinion withdrawn on grant of reh'g, substituted at* 7 So. 3d 251 (Miss. 2009). In the withdrawn *Young* opinion, the then-majority Court noted that, although the irresistible-impulse doctrine remained a part of Mississippi law, "this Court has never addressed its applicability in the context of a medical malpractice case filed against a doctor, who treated a patient for the mental condition which led to a patient's suicide." The Court then held that the doctrine was "inapplicable to a physician or other medical provider from whom treatment is sought for a mental condition, where the plaintiff claims that the negligent care led to the suicide." The trial court in the case *sub judice* noted the above language but also noted that the case was withdrawn, the second *Young* opinion superceded the first, and the ultimate decision of this Court never addressed the cross-appeal involving the irresistible-impulse doctrine. Thus, the status of the law in Mississippi remained unchanged.

¶15. Truddle argues that the trial court erred in interpreting *Edgeworth* as prohibiting negligence claims arising from suicide and that Mississippi caselaw "traditionally acknowledged the viability of [negligence claims for suicide] particularly where, as here, the Defendants allegedly owed the decedent some form of duty." The crux of Truddle's argument, therefore, is that Carmichael's suicide was the result of medical malpractice, i.e., negligence.

7

¶16.    A medical-malpractice cause of action in Mississippi tracks the typical negligence action, placing the burden on the plaintiff to prove "(1) the existence of a duty by the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) a failure to conform to the required standard; and (3) an injury to the plaintiff proximately caused by the breach of such a duty by the defendant." *Pace*, 122 So. 3d at 68 (quoting *Hubbard v. Wansley*, 954 So. 2d 951, 956-57 (Miss. 2007)).

¶17.    Nothing in Mississippi caselaw, save the irresistible-impulse doctrine, however, abrogates the general rule that suicide constitutes "an independent, intervening and superseding event that severs the causal nexus between any wrongful action on the part of the defendant." *Shamburger*, 84 F. Supp. 2d at 798 (citing *Nicholson on Behalf of Gollott v. State*, 672 So. 2d 744, 753 (Miss. 1996)). The *Edgeworth* Court specifically stated that the irresistible-impulse doctrine applied as an exception to the general rule regarding suicide because "[a] higher degree of responsibility is imposed upon a wrongdoer whose conduct was intended to cause harm than upon one whose conduct was negligent." *Edgeworth*, 214 So. 2d at 586.

¶18.    Furthermore, this principle extends to medical-malpractice claims. In *Haney v. River Oaks Hospital*, the plaintiff brought a medical-negligence action against a doctor and hospital where a patient committed suicide after being released from the hospital over her family's objections. *Haney v. River Oaks Hosp.,* 2006-CA-00219-SCT (Order, May 17, 2007).The trial court granted the doctor's and hospital's motion for summary judgment, which this Court affirmed per curium. *Id.*

8

¶19. Nothing in Truddle's complaint goes beyond an argument that Dr. Malhotra and Baptist were negligent in not recommending a psychiatric evaluation, even though Carmichael never told Dr. Malhotra or anyone at Baptist that he was considering suicide. At most, Dr. Malhotra and Baptist were on notice that Carmichael believed his medication was making him "crazy," and that Carmichael acted bizarrely when he attempted to leave the hospital. Dr. Malhotra and Baptist were never on notice that Carmichael was suicidal. Nevertheless, Truddle argues that the side effects of Reglan include depression and suicide, which should have been investigated. But, under Mississippi law, this failure alone is not sufficient to sustain a cause of action for a suicide. In such a case, the plaintiff must show that the defendant committed an intentional act that led to an irresistible impulse to commit suicide in order to prevail. *Edgeworth*, 214 So. 2d at 586-88. Truddle made no such allegation against Baptist or Dr. Malhotra. Therefore, the Desoto County Circuit Court properly granted Baptist's and Dr. Malhotra's motion for summary judgment.

¶20. In her second argument, Truddle relies on *Mississippi Department of Mental Health v. Hall*, 936 So. 2d 917 (Miss. 2006); *Carrington v. Methodist Medical Center., Inc*., 740 So. 2d 827 (Miss. 1999); *Mississippi State Hospital v. Wood*, 823 So. 2d 598 (Miss. Ct. App. 2002); and *Lyle v. Johnson*, 126 So. 2d 266, 269 (Miss. 1966), asserting that Mississippi law recognizes a defendant's liability for another's suicide in the context of a negligence action. However, none of the Mississippi cases cited by Truddle addresses a suicide in which the decedent already had been released from the defendant's custody. Instead, the cases cited involve patients committing suicide or injuring themselves in the custody and control of the facility, and in some cases, the decedent or plaintiff already had expressed a desire to harm

9

himself or herself. *See **Miss. Dep't of Mental Health v. Hall***, 936 So. 2d 917 (Miss. 2006) (state hospital sued in a negligence action for mental patient who attempted to escape from an unlocked window); ***Carrington v. Methodist Med. Ctr., Inc.***, 740 So. 2d 827 (Miss. 1999) (addressing whether defendant was shielded by Mississippi Code Section 41-21-105 after wrongful-death action was filed relating to suicide of a patient in the defendant's custody who was to be closely monitored); ***Miss. State Hosp. v. Wood***, 823 So. 2d 598 (Miss. Ct. App. 2002) (wrongful-death action against State Hospital at Whitfield after a patient, voluntarily hospitalized for suicide attempts, committed suicide in the facility); ***Lyle v. Johnson***, 126 So. 2d 266, 269 (Miss. 1966) (pre-***Edgeworth*** case in which decedent committed to private sanitarium left the premises and drowned).

¶21. In contrast, in the case *sub judice*, Carmichael, who never expressed to Dr. Malhotra a desire to harm himself, was not under the control of Baptist or Dr. Malhotra when he committed suicide. The Mississippi cases Truddle cites for her argument that Mississippi recognizes a defendant's liability for another's suicide because he or she owed the defendant a duty of care are inapposite to the facts of this case. In those cases, the defendants had the ability to control the patient's conduct, whereas here, Baptist and Dr. Malhotra did not. Therefore, we affirm the judgment of the trial court.

## CONCLUSION

¶22. Truddle failed to allege any intentional conduct on the part of Dr. Malhotra or Baptist that proximately created an irresistible impulse in Carmichael to commit suicide, as required by Mississippi law. And despite Truddle's allegations, there is no evidence Carmichael ever sought psychiatric treatment from Dr. Malhotra or Baptist. Furthermore, Truddle's assertion

10

that the defendants committed an intentional act by not providing a psychological consult does not meet the requirements of the irresistible-impulse exception as espoused in *Edgeworth*. Therefore, the judgment of the Desoto County Circuit Court is affirmed.

¶23. **AFFIRMED**.

**RANDOLPH, P.J., LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., KITCHENS AND COLEMAN, JJ.**

**KING, JUSTICE, DISSENTING:**

¶24. The claim in today's case is essentially medical negligence based on the failure to address harmful effects of a drug, even after medical providers were informed of these negative effects occurring in the decedent. The trial court and the Majority find that the plaintiff's claim is not actionable, as a matter of law, because the claim is not based on intentional conduct and the decedent was not under the direct supervision of the defendants. I find that the claim is actionable and that there are questions of fact for the jury in today's case. Therefore, I dissent.

¶25. This Court's seminal case addressing wrongful death claims stemming from suicide is *State for Use and Benefit of Richardson v. Edgeworth*, 214 So. 2d 579 (Miss. 1968). The plaintiff in *Edgeworth* filed suit against justices of the peace and deputy sheriffs, claiming that the decedent's suicide resulted from the defendants' abuse of the legal process. *Id.* at 581. After several efforts to collect bad checks, the defendants went to the decedent's home at 1:30 a.m. with two arrest warrants. *Id.* at 583. Upon hearing of the two warrants, the decedent's wife, who was pregnant, fainted. *Id.* In an effort to not go to jail, the decedent

11

asked to borrow money from neighbors, but he was unable to get the funds. *Id.* at 584. The decedent then returned to his home, went into his bedroom, and shot himself. *Id.*

¶26.    This Court held in *Edgeworth* that "where the suicide is committed in response to an uncontrollable impulse, recovery may be had if the mental state of deceased was substantially caused by the defendants' intentional wrongful acts, and whether they were substantial factors in bringing about the death by suicide may be issues for the jury." *Id.* at 587. Importantly, *Edgeworth* did not expressly foreclose negligence claims such as the one presented in today's case. Rather, it specifically addresses irresistible or uncontrollable impulses stemming from a defendant's intentional conduct. Further, *Edgeworth* compared the issues presented in that case to *Tractor Company v. Spencer*, 87 So. 2d 272 (1956), which allowed workers' compensation death benefits for a suicide which apparently stemmed from an on-the-job compensable injury, not an intentional tort. *Id.*

¶27.    As the Majority notes, federal courts have interpreted *Edgeworth*'s irresistible impulse exception as the only available claim in Mississippi for wrongful death stemming from suicide. *See **Shamburger v. Grand Casino of Miss., Inc./Biloxi***, 84 F. Supp. 2d 794, 798 (S.D. Miss. 1998). A review of this Court's caselaw, however, supports the contention that the claims in today's case are actionable. For example, in *Young v. Guild*, 7 So. 3d 251 (2009), this Court addressed the jury instructions given in a medical negligence case against a psychiatrist arising from the decedent's suicide. One instruction given stated:

> the burden of proof is on the plaintiff to prove that the psychiatrist was guilty of negligence which caused the injury. In this case, the plaintiff must prove by a preponderance of the evidence that [the defendant] was negligent in his treatment of [the decedent] and that such negligence, if any, caused her suicide.

12

*Id.* at 259. This Court held that the instructions given – including the above-quoted instruction – "fairly and adequately instructed the jury on the applicable primary rules of law. The jury instructions correctly defined the elements of medical negligence, including the standard of care applicable to [the defendant] in this case and treatment of [the decedent]." Like today's case, the decedent in *Young* had been discharged from inpatient care a number of days prior to her suicide. *Id.* at 255. Thus, the Majority's implication that Mississippi caselaw does not support a cause of action when the decedent has been released from the defendant's custody is amiss. (Maj. Op. at ¶ 20). Further, the Majority improperly relies on the *withdrawn Young* opinion. (Maj. Op. at ¶ 14). The opinion relied on by the Majority was withdrawn and substituted by the opinion discussed above.

¶28. Further, other cases in Mississippi have allowed wrongful death claims arising from suicide. *See Carrington v. Methodist Med. Ctr., Inc.*, 740 So. 2d 827 (Miss. 1999). Other jurisdictions permit claims similar to Truddle's. *See Edwards v. Tardif*, 692 A.2d 1266, 1272 (Conn. 1997) (claim maintained against internist who prescribed large dosage of anti-depressants to decedent without psychiatric evaluation or suicide assessment); *Stafford v. Neurological Med., Inc.*, 811 F. 2d 470, 473 (8th Cir. 1987) (claim maintained against physician and medical service after form incorrectly stated that decedent, who committed suicide, had a brain tumor). *See also Orcutt v. Spokane County*, 364 P. 2d 1102 (Wash. 1961) (applying irresistible impulse rule to negligent acts resulting in suicide).

¶29.    In today's case, Eric Carmichael was prescribed Reglan.[2]  Dr. Noberto Alvarez, a medical expert, testified that Reglan can affect mental activity and may be associated with suicidal thinking.

¶30.    Shortly after taking a dose of Reglan, Carmichael began acting strange. His girlfriend, who was visiting him at the hospital, testified that Carmichael began acting unusual and that she feared he might become violent.  Carmichael then ripped his IV lines out of his arm and left his hospital room.  He then yelled at and hit the nursing staff who attempted to stop the bleeding from his IV lines.  Carmichael also reported to the nursing staff that someone had tried to rape him.  Notes of this incident were placed Carmichael's file, although his treating physician admittedly did not read them.  When the physician, Dr. Malhotra, informed Truddle and Carmichael that Carmichael could be discharged, Truddle requested that Carmichael not be discharged because of the events that had occurred the previous night. According to Truddle, Carmichael also asked to stay at the hospital.  Despite these requests, Dr. Malhotra discharged Carmichael, instructing him to return if he did not feel better.

¶31.    Carmichael continued to act strangely after his hospital discharge.  At one point, he told Truddle that he no longer wanted to take Reglan because it was "making him crazy." After a few days, Truddle accompanied Carmichael to a followup visit with Dr. Malhotra. Carmichael reported to Dr. Malhotra that the medicine he had been prescribed was "making him crazy."  Despite this complaint, Dr. Malhotra wrote another Reglan prescription for

---

[2] Reglan is a gastrointestinal medication which may cause the following side effects: "depressed mood, thoughts of suicide or hurting yourself; hallucinations, anxiety, agitation, jittery feeling, trouble staying still." Reglan, http://www.drugs.com/reglan.html (last visited November 4, 2014).

Carmichael.  Carmichael committed suicide two days after the followup appointment with Dr. Malhotra.

¶32.    Under the facts of today's case, Truddle's claim is actionable.  The defendants had notice that Carmichael was experiencing serious side effects from his prescribed medications. Despite requests to no longer take the medication, Dr. Malotra continued to prescribe Reglan. Not addressing the reported, and harmful, effects of the medication is an actionable negligence claim.  As such, I disagree with the Majority's finding that summary judgment was proper in today's case.  Therefore, I dissent.

**DICKINSON, P.J., KITCHENS AND COLEMAN, JJ., JOIN THIS OPINION.**